**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VERNAIZE K. COLEMAN, CYNTHIA HOLMES, DANIELA PORCINO, REBECCA ANGULO, TERRY POWELL and NANCY SHUSTERMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OPTUM, INC., INSIGHT GLOBAL, LLC, APEX SYSTEMS, INC., EQUITY STAFFING GROUP, INC., ADECCO USA, INC. and NEW YORK CITY HEALTH and HOSPITALS CORPORATON,<br><br>Defendants, | CASE NO. |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF**
**WARN ACT, 29 U.S.C. § 2101, ET SEQ. NEW YORK WARN ACT, NYLL § 860 *et seq***
**and WAGE THEFT PROTECTION ACT, NYLL § 195(3)**

Plaintiffs Vernaize K. Coleman, Cynthia Holmes, Daniela Porcino, Rebecca Angulo, Terry Powell, and Nancy Shusterman ("Plaintiffs") bring this action on behalf of themselves and a putative class of similarly situated former employees, against Defendants Optum, Inc., Insight Global, LLC, Apex Systems Inc., Equity Staffing Group, Inc. and Adecco USA, Inc., and Defendant New York Health and Hospitals Corporation, and in support thereof, allege as follows.

**NATURE OF THE ACTION**

1.      New York State Labor Law requires that employers provide at least 90 days' advance notice prior to a mass layoff and furnish with every payment of wages a statement or stub. The Plaintiffs bring this action on behalf of themselves and more than 1,500 employees

who worked to contain the outbreak of COVID-19 for almost two years in New York City (the "City"). None were terminated with 90 days' notice as required by the New York Worker Adjustment, Retraining and Notification Act ("NY WARN") Act, New York Labor Law ("NYLL") § 860 *et seq*. Many received less than the 60 days' notice required by the federal Worker Adjustment, Retraining and Notification Act ("WARN") Act , 29 U.S.C. § 2101 *et seq*., (and, cumulatively with NY WARN, the "WARN Acts"). And many received no pay statement or stub as required by the New York Wage Theft Protection Act ("WTPA"), NYLL § 195(3).

2.     Plaintiffs and the similarly situated employees staffed the City's COVID call center. Their job was to separate the City's infected and exposed persons from the population, which they did. To pay them, the City received federal funding, and its New York City Health and Hospitals Corporation ("HHC") led the effort. HHC contracted with private vendors to set up the call center and staff it. The prime contractor was a United HealthCare Group subsidiary, Optum. It filled the ranks with its own personnel and others from staffing agency sub-contractors

3.     Although the work was called temporary, Plaintiffs were never told when their jobs would end until they were terminated over March and April 2022. Instead of 90 days' advance notice they received far less. There was no emergency that precluded Defendants from providing them WARN notice. And nothing precluded HHC from providing a pay statement explaining to those it let go what their deposited  amounts comprised.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332, 1367 and 29 U.S.C. § 2104(a)(5).

5.     Venue is proper in this District pursuant to 29 U.S.C. § 2104(a)(5).

## **THE PARTIES**

### ***Plaintiffs***

6.      Plaintiff Vernaize Coleman was employed as a Supervising Public Health Advisor Level 3 (Case Investigator Supervisor) from May 20, 2020 until she was terminated on April 29, 2022.

7.      Plaintiff Cynthia Holmes was employed as a Public Health Adviser Level 1 (Case Investigator) from June 1, 2020 until she was terminated on April 29, 2022.

8.      Plaintiff Daniela Porcino held the position of Contact Tracer/Case Investigator Supervisor with Insight Global LLC to work for United Healthcare Group/Optum ("UHG/Optum") from June 1, 2020 until April 7, 2022 when she was terminated.

9.      Rebecca Angulo was employed as a Contact Tracer by Apex Systems, Inc. to work for UHG/Optum from June 22, 2020 until April 15, 2022 when she was terminated.

10.      Terry Powell was hired by Equity Staffing Group, Inc. on May 18, 2020, to work as a Supervisor for UHG/Optum.  She was terminated on April 29, 2022.

11.      Nancy Shusterman was employed by Adecco USA, Inc. to work as a Supervisor for UHG/Optum.  She was hired on June 1, 2020 and terminated on April 8. 2022.

### ***Defendants***

12.      Upon information and belief, Defendant Optum Inc. is incorporated in the state of Delaware.

13.      Upon information and belief, Defendant Optum Inc. ("Optum" or "UHG/Optum") maintains its corporate headquarters at 13625 Technology Drive, Eden Prairie, Minnesota.

14.      Upon information and belief, Defendant's parent company is UnitedHealth Group Incorporated ("UHG").

15.     Upon information and belief, Defendant Optum is a diversified healthcare services business that operates under the names Optum, OptumHealth, OptumInsight and OptumRx throughout the United States.

16.     Upon information and belief, Optum employs over 190,000 people worldwide and provides technology-based platforms and systems to its clients, which include government agencies, and employers.

17.     Insight Global, LLC ("Insight Global") is a Delaware limited liability company with headquarters at 1224 Hammond Dr Suite 1500, Atlanta, Georgia.

18.     Apex Systems, Inc. ("Apex") is a Virginia corporation headquartered at 4400 Cox Rd Ste 100 Glen Allen, Virginia.

19.     Equity Staffing Group, Inc. ("Equity Staffing") is a Delaware corporation headquartered at 8310 S Valley Hwy Ste 135 Englewood, Colorado.

20.     Adecco USA, Inc. ("Adecco") is a Delaware corporation with headquarters at 10151 Deerwood Park Blvd Bldg. 200, Jacksonville, Florida.

21.     NYC Health and Hospitals Corporation ("HHC") is a public health care delivery system, and was created as a public benefit corporation by the New York City Health and Hospitals Corporation Act (L. 1969, C. 1016, eff. May 26, 1969).

**Facts Common to WARN Act Claims of All Employees**

22.     Disease outbreaks are controlled by testing followed by "tracing." Persons who test positive are interviewed by "case investigators" to elicit who they've been in contact with. These persons are then called by either the case investigators or workers known as "contact tracers".  These calls are designed to get those infected or exposed to isolate and

quarantine, and to provide them support.  In New York City, these calls were made from one virtual call center by the Plaintiffs and similarly situated employees.

23.      Prior to COVID, New York City used tracing to successfully limit the spread of tuberculosis, measles, HIV/AIDS, Legionnaire's disease and Ebola through its Department of Health and Mental Hygiene ("DOHMH").

23.      As COVID-19 took hold, the huge volume of cases outstripped the capabilities of any one entity to carry out tracing.

24.      By early May 2022, private sector organizations and networks were already playing an important part in testing and tracing, among them Optum and Kaiser Permanente.

25.      By then, New York State was outsourcing contact tracing to private sector contractors who recruited, managed and paid thousands of contact tracers to operate the State's call center.

26.      In March 2020, the City established an interagency working group to receive and spend billions of federal dollars on COVID testing and tracing.

27.      The City's effort was led by its Office of Management and Budget, and included DOHMH, HHC and other city agencies and offices such as the NYC Mayor's Office and the Mayor's Senior Advisor for Public Health.

28.      The effort was called the NYC Test and Trace Corps ("T2") and then-Mayor Bill de Blasio placed it under the umbrella of HHC.

29.      Upon information and belief, DOHMH would apply for the funding and HHC would oversee the expenditures.  Having no experience in contact tracing, HHC contracted the function out to private vendors.

30.    Upon information and belief, at that time HHC's ambulatory care division had been using a communications infrastructure provided by its contractor, UHG//Optum which included a virtual call center operated by remote Optum managers and agents.

31.    Upon information and belief, T2 outsourced the COVID "Trace" function to Optum.  Under the arrangement, Optum would host, build, equip, manage and staff an outbound virtual call center to perform the T2 trace function.

32.    Upon information and belief, Optum contracted with technology partners, including Change Healthcare and McKinsey, to set up and maintain the call center's virtual platform, and Optum contracted with staffing companies to provide personnel to carry out the call center's day-to-day tracing operations.

33.    Optum split the contact tracing function into two job titles "case investigator" and "monitor."   Case investigators would interview "infected" and "exposed" persons. Monitors would place check-up calls to those in quarantine, to detect signs of disease and to provide support.

34.    On information and belief, Optum created the job descriptions for Case Investigators and Monitors.

35.    On information and belief, many Case Investigators were recruited by an agency called The Bachrach Group.  They were placed on the payroll of HHC, as nominal HHC employees.   On information and belief, by December 2020, The Bachrach Group had made over 2,000 hires.

36.     On information and belief, certain staffing agency subcontractors recruited Monitors, including as Insight Global, LLC, Apex Systems, Inc, Equity Staffing Group, Inc. and Adecco USA Inc (the "Staffing Agencies").  These Monitors were carried on the payroll of the respective contractor that had recruited them.

37.     On information and belief, the Monitors all worked on the Optum call center. Like them, their supervisors were also on the payroll of agency subcontractors.

38.     The Case Investigators all worked on the Optum call center, but they and their supervisors were all carried on the HHC payroll.

39.     In the chain of command, all supervisors reported to a layer of Optum managers. The Optum managers, therefore managed the supervisors, and ultimately the Case Investigators and Monitors.

40.     On information and belief, T2 Case Investigators were to have a college degree and healthcare experience was preferred, many had no health-related course credits or experience. For Monitors, the minimum requirements were a high school diploma and some college training or equivalent and the ability to speak, read, and write English clearly and concisely. They were to be proficient with computers and able to enter data into electronic tracking systems.

41.     It was expected that hires pass a free, 6-hour online certificate course "COVID-19 Contact Tracing" offered by the John Hopkins University (to which over 1.3 million have enrolled). The course website notes that the "job qualifications for contact tracing positions differ throughout the country and the world, with some new positions open to individuals with a high school diploma or equivalent." https://www.coursera.org/learn/covid-19-contact-tracing?edocomorp=covid-19-contact-tracing

42.     All the Case Investigators and Monitors worked remotely.

43.     All the Case Investigators and Monitors were given laptops and Optum email addresses.

44.     Monitors received laptops from Optum preloaded with Optum's software.  When they booted up, they were in Optum's secured VPN network, where they accessed all of the Optum furnished programs, applications, tools, and materials they needed to do their jobs.

45.     Case investigators were provided laptops through HHC.  From a browser, they logged in to Optum's secure Citrix server through which they accessed all the Optum furnished technology.

46.     All the Case Investigators and Monitors performed their jobs on Optum's Salesforce platform using Twilio call center application.

47.     All the Case Investigators and Monitors received their schedules, including when to take a break and lunches from Optum via the Calabrio application.

48.     Calabrio tracked and recorded what Case Investigators and Monitors did throughout the day.

49.     All the Case Investigators and Monitors were provided an orientation by Optum using materials provided by Optum. They received notifications regarding their training via their Optum email.

50.     All the Case Investigators and Monitors were trained by Optum

51.     All the Case Investigators and Monitors could access a site called Hub on the intranet of UnitedHealth Group ("UHG"), Optum's parent, which site later was called SPARQ.

52.     All the Case Investigators and Monitors chatted and met with their supervisors on Optum's Microsoft Teams.  From there they accessed Optum's Microsoft Sharepoint where they found all of the materials, forms and job aides they needed to perform their duties.

53.     While the employees interfaced with their Staffing Agencies regarding  the administrative aspects of their jobs, they carried out their day-to-day job duties in Optum's domain and under its sole control.

54.     The Supervisors provided guidance and support to the Case Investigators and Monitors.

55.     Supervisors had no hiring and firing responsibility, rather their Optum managers possessed that authority.

56.     Around November 2020, many Monitors learned that more Case Investigators were to be hired to work as nominal employees of HHC, a job which came with higher pay and benefits, and, impliedly, more job security, than was provided by the Staffing Agencies.

57.     Upon information and belief, monitors received few if any benefits, such as vacation or sick leave when working for Optum directly or the agencies. They were paid by the hour.

58.     In or around December 2020, the monitors who switched to the HHC payroll had to return their Optum-issued laptop and received a similar one from HHC.  They also received a second, HHC email address.

59.     Like the other Case Investigators, they were given orientation and trained by Optum and used the same Optum technology, tools, and materials to do their jobs.

60.     Calabrio was one of several activity tracking programs in the suite of Optum work tools.  Using Calabrio, managers were able to "see" in real time what case investigators and monitors were doing, or review what they had done afterwards.

61.     Optum's workforce management tools allowed them to "see" in real time, if the employees were complying with their minute-by-minute schedules set by Optum.    It allowed the manager to see, at a glance, if the employees were deviating from their schedule by being "idle" when they should have been on the phone, or were "active" on the phone during a scheduled break.

62.     Optum used schedule "adherence" as an important metric when rating the call center employees' performance.  Optum's managers would have "adherence" data which would show up visually on dashboards so that they could address non-adherence issues.

63.     Optum managers measured the number and length of calls, and listened to calls to evaluate them using a complex matrix, in order to rate employees' performance.

64.     Optum's manager's (or subcontractors) rated the employees on scales of 1-100 points. Demerits were given if the employee's words and intonations were not sufficiently "relaxing" or fostering a sense of "trust."  Using artificial intelligence and data analytic tools, Optum managers measured the case investigators and monitors' personal investment in their work, known as their "engagement," another metric used to evaluate them.

65.     Lower-scoring employees were warned, reprimanded or released.

66.     Optum authored and furnished the case managers and monitors with the scripts that they had to follow when making calls, and Optum would occasionally revise them.

67.     Optum thus planned, scheduled, scripted, and managed the day-to-day activities and work performed by the supervisors, investigators, and monitors.

68. Optum managers controlled the assignments, the parameters of the operations and the work. They would decide which employee would do what and when, and rate how each employee performed, regardless of which Staffing Agency processed the employee's payroll. Staffing Agencies merely needed to be told the hours the employees worked, to calculate their pay.

69. On information and belief, all the work was performed on a virtual call center platform run from Optum's headquarters (the "Facility").

70. In the normal course of business, neither Case Investigators on the HHC payroll or Monitors on Optum's payroll, had any interaction with HHC management regarding the performance of their jobs.

71. Neither upper-level HHC management, nor Optum management defined for the Case Investigators and Monitors what the end date of their employment would be, until they were provided their date of termination starting on February 28, 2022 through April 29, 2022.

72. When they were onboarded, neither Optum nor HHC told them that their jobs would last for a fixed duration or end on any certain date or upon the occurrence of a particular event or condition.

73. Some thought there was a "contract" that might expire in the spring of 2021. Others thought there was a contract that would end in the fall or year end of 2021.

74. Based on a "town hall" meeting in the fall of 2021, many Case Investigators and Monitors understood that their jobs would be extended until at least the end of June 2022, because that is what they heard T2 director, Dr. Ted Long, say at the meeting.

75. At peak, there were about 4,000 Case Investigators and Monitors but the number decreased before the "Omicron" wave arrived in December 2021.

76.     Omicron's surge caused T2 to recruit more Case Investigators.

77.     On January 7, 2022, Omicron broke the old record of 20,000 new cases by causing 90,000 cases to be reported in New York State at that time.

78.     The surge created a bottleneck and backlog that prevented Case Investigators from initiating timely contact with new cases. By the time they reached them it was too late – the infected person was beyond the quarantine period and no longer contagious – making isolation and tracing of less value.

79.     On January 12, 2022, New York State announced that public health tracing had been so overwhelmed by the surge it was suspending tracking.  Dr Mary Bassett, the head of NYS Department of Health stated that it was no longer practical to do the detective work on positive cases since the number had spiked so high

80.     As of Jan 25, 2022, on information and belief there were 2,000 employees engaged in T2 case investigation-tracing.

81.     On February 10, 2022, the CDC posted updated guidance entitled "Scaling Up Staffing Roles in Case Investigation and Contact Tracing" https://www.cdc.gov/coronavirus/2019-ncov/php/contact-tracing/contact-tracing-plan/scaling-staff.html

82.     In it, the CDC stated that: "*Given each patient with COVID-19 will likely have multiple close contacts, staffing plans should include a greater number of contact tracers to meet this demand.*" (Emphasis in original).  *Id*. *12-13.

83.    On February 28, 2022, the CDC posted its updated Interim Guidance on Developing a COVID-19 Case Investigation & Contact Tracing Plan https://www.cdc.gov/coronavirus/2019-ncov/php/contact-tracing/contact-tracing-plan/overview.html

84.    In it, the CDC called for case investigation and contact tracing to be shifted, not ended.  It stated "investigating and tracing remained fundamental" and "core" to disease control." *Id* *1-2.  It clarified that although *universal* case investigation and contract tracing "are not recommended", they should be shifted towards *priority* cases and the notification of *priority* close contacts. It outlined the new priorities. *Id*. *1

85.    Specifically, while the CDC stated that case investigation and contact tracing was "most effective when it was swift and thorough" Therefore, it was best to investigate and contact trace within 5 days of the positive test.  *Id*. *2

86.    The CDC recommended that "even if health departments are not performing full-scale case investigation and/or contact tracing [they should] continue to engage in case and contact notification in settings such as K-12 schools, institutions of higher education (IHEs), early care and education programs," to "ensure that those who are infected or have potentially been exposed know what actions they should take to remain safe and reduce transmission.  *Id*. *10.

87.    The CDC recommended that health departments augment ongoing contact tracing by "[o]ffer[ing] vaccination and testing as part of case investigation and contact tracing activities, recommend[ing] vaccination for cases and close contacts who are unvaccinated or not up to date with COVID-19 vaccines, and implement[ing] testing strategies once an outbreak is identified in a high-risk setting or priority group." *Id*. *9-10.

88.     The priorities of T2 Case Investigators and Monitors had long included more than *universal* tracing.

89.     As for serving the K-12 school population, Case Investigators were reassigned in the fall of 2021 to work for the NYC Board of Education.  When public school students returned to school in person, the New York City Board of Education set up a virtual "Situation Room." to contact and advise parents of positive cases that required quarantine.  Many call center Case Investigators were temporarily reassigned to the Situation Room to handle these special needs and only returned to their regular call center work in January 2022.

90.     Many of the Case Investigators' responsibilities were broadened in April 2021, when they began screening COVID patients for eligibility to receive monoclonal antibody treatment. Case Investigators would assess during the initial intake call whether someone was a candidate and, when appropriate, provided information about how to access the treatment.

91.     Nevertheless, on February 28, 2022,  as the CDC was reaffirming that investigating and tracing remained "fundamental" and "core", HHC rolled out its ostensibly pre-planned layoff.  It announced to its T2 "Trace" workforce of 874 employees that they would be terminated on April 29, 2022, purportedly because the" CDC is no longer recommending universal contact tracing."

92.     In its carefully-worded February 28 email, HHC did not announce the completion or elimination of the T2 Contact Tracer Program.  Rather, it referred to a "reduced need in contact tracing" and  "a reduction in the COVID-19 response workforce." It was that *reduction* that it said it would "complete," not the tracing functions.

93.     It was just the "temporary/provisional Contact Tracing staff" who were inform[ed]" that they were "expected" to be separated from their jobs effective April 29, 2022.

94.     The email stated:

We write to inform you that due to the reduced need for COVID-19 contact tracing services in the City of New York, NYC Health + Hospitals will complete a reduction in its COVID-19 response workforce. This correspondence is to further inform you that you are expected to be separated from your temporary/ provisional employment as a [title, e.g., **Supervising Public Health Adviser]** with the NYC Health + Hospitals Test and Trace Contact Tracer Program effective **Friday, April 29, 2022.**

As you are aware, your temporary/provisional employment was time-limited and based on the need for contact tracing services.   This workforce reduction affects all temporary/provisional Contact Tracing staff commencing on **Friday, April 29, 2022** and is expected to be permanent. Please be aware that because you are a temporary/ provisional employee, there are no "bumping" rights associated with this workforce reduction. (Emphasis in original)

95.     That day, Dr. Ted Long, the head of T2, emailed a separate message:

Dear Contact Tracers

Thank you for all you have done. You have succeeded in keeping our city safe during a very challenging time. I am emailing you with an important update. Given the sharp decline in cases, widespread vaccination, and new effective treatments, the CDC is no longer recommending universal contact tracing. Therefore, Trace will be coming to an end in late April – giving us 8 final weeks to complete your current work and get New Yorkers ready for the next phase as we learn to live with COVID.

96.     The next day, on March 1, 2022, a NYC spokesperson told the New York Times that the "city would continue tracing in high-risk settings, such as nursing homes and homeless shelters, but that the responsibility would revert to the health department."

https://www.nytimes.com/2022/03/01/nyregion/nyc-covid-contact-tracing.html

97.     In March 2022, new COVID cases dropped in number and case investigators' duties were expanded to address other, related priority needs in addition to their regular case investigations.

15

98.     Noting it was "a time of need," on March 10, 2022, the NYC Test & Trace Corps announced a new COVID Treatment Outreach (CATCH) initiative that would "quickly contact New Yorkers at the highest risk of developing serious or severe COVID-19 infections, with a priority on those living in communities hardest hit by the pandemic."  It was to be staffed by "seasoned Case Investigators from the Trace Program who will be able to make hundreds of calls a day, 7 days a week."  They would offer monoclonal antibody treatment options, and connect those with COVID-19 to at least a dozen different resources.

99.     Chief Technology Officer of NYC Test & Trace Corps called those assigned to CATCH "an amazing team of dedicated tracers, who are representative of the communities they serve and bring nearly two years of experience to each New Yorker they speak with to support and educate in a time of need."

100.    In early March, when reported COVID cases dipped to about 600-700 a day in New York City, Optum managers made staffing decisions to reassign case investigators.  Optum gave some additional work, such as making "continued care" calls in addition to their regular case investigations.  Optum provided them with new scripts to assess if past clients had Long COVID symptoms or needed any resources.

101.    The Optum managers, upon information and belief, made staffing decisions to redeploy Case Investigators to making calls to the unvaccinated to facilitate their getting shots.

102.    Optum reassigned other Case Investigators were to fix errors and gaps in the call center data records and systems and to prepare for the next wave of the virus.

103.    The spread of COVID rose through March to an average of about 1,300 cases per day, and it continued its climb in April, causing the Case Investigators, who had been redeployed, to resume their regular investigation duties.

104.     When the Investigators were terminated on April 29, the City's new case average had almost doubled from the beginning of March to 2,400. By May 3, it topped 3,000.  By May 13, the day HCC received their final pay, it was over 4,000.

105.     On May 17, New York City entered the "high" alert level. It advised those at increased risk to avoid indoor gatherings and "strongly recommended" that all wear masks in public indoor settings.

106.     On July 1,2020 the reported new cases in the City was 293 (7 day avg).  On June 30, 2022, it was 3,546.

107.     On information and belief, HHC incurred $1.4 billion of expenses for its Test and Trace in its fiscal year 2021.   Of that $417 million went to "Tracing".  The vast majority of the revenue to pay for these expenses continued to come from federal government programs, including Center for Disease Control grants and FEMA funding.

108.     In November 2021, based on the same funding, HHC projected these expenses to rise to $1.478M in fiscal year 2022, except that its Tracing expenditures would drop by 35% to $270M.

109.     The HHC Board of Directors were informed nevertheless in December 2021 meeting that "[a]s community spread of COVID-19 increases, testing and contact tracing remain bedrocks of our ability to fight the spread of this disease."

110.     On March 10, 2022, Mayor Eric Adams outlined his vision for New York City's economy recovery and future with five "pillars" - the fourth of which was "[c]onnecting New Yorkers to quality jobs and in-demand skills" https://www1.nyc.gov/office-of-the-mayor/news/119-22/mayor-adams-rebuild-renew-reinvent-blueprint-nyc-s-economic-recovery#/0

17

111.    Eighteen months earlier, on September 25, 2020, then-Mayor De Blasio similarly issued his recovery agenda, with four "principles," the third of which was "[c]reate high-quality jobs: We will encourage the creation of new, high-quality jobs that also help improve the City's health." The other principles were: [c]ontinue the City's momentum in fighting back COVID-19", [m]ake the City a hub for public health research" and "[c]ontinue making New York the fairest city in America".

112.    In response, the New York City Council Health Committee Chair Mark Levine added that "this crisis has also created an opportunity to grow public health and life sciences sectors as critical jobs creators in New York."  https://www1.nyc.gov/office-of-the-mayor/news/677-20/mayor-de-blasio-new-york-city-s-recovery-agenda

113.    On May 1, 2022, a director of the Test and Trace, door-to-door program was quoted in the Gothamist as having stated that "the health department will be responsible for all remaining contact tracing. A few hundred corps members will stay on at the health department. But the rest --  [] will be out of a job." Indeed, the [DOHMH] is slated to continue to perform case investigation and contact tracing in specific settings and groups at increased risk.

114.    Upon information and belief, Optum's contract to provide the operational support for the COVID call center and staffing, along with its subcontractors and partners, was extended to run through December 2021.  But, by November 18, 2021, the contract for managing certain call center services had been continued by HHC through June 30, 2022.

115.    Upon information and belief, that date was announced to the Investigators by T2's head, Dr. Ted Long, at his fall 2021 town hall meeting, when he told them their service was being extended to June 30, 2022.

116.     As of April 29, 2022, contact investigation had been neither been completed nor ended in New York City.   Upon information and belief, contact testing was being carried on by contracted "partners" of T2, including at HHC testing sites around the City.  It was being carried on by the DOHMH and private organizations.

**Factual Allegations Relating to the Optum and Staffing Agency Defendants**

117.     Upon information and belief, in or around May 2020, the Staffing Agencies contracted with Optum to recruit individuals to staff Optum's virtual call center as "Monitors."

118.     The Staffing Agencies primarily acted on behalf of Optum as recruiters for their employees, as well as administrators of their pay and benefits, not as the employers assigning, managing, controlling, and evaluating the employees'work.

119.     Optum provided the Staffing Agencies with the monitor job description, compensation level, and hiring criteria.

120.     Under the arrangements, the Staffing Agencies would administer the payroll that Optum would fund.  The Staffing Agencies kept track of the Monitors' time so they could issue accurate checks (direct deposits). The Staffing Agencies could also provide a minimum level of benefits.

121.     Optum dictated the terms of personnel policies, disallowing any vacation or paid time off, and requiring doctor's notes for sick day leave, sometimes in contradiction of the Staffing Agencies' policies.

122.     The Staffing Agencies interviewed the hirees, Optum then conducted the onboarding.

123.    Optum provided an Optum email address and Optum laptop preloaded with its suites of programs, applications and connections to its systems and servers, that the Monitors would use to perform their jobs.

124.    Optum's Operations Managers controlled every aspect of the monitors' jobs, other than the issuance of the checks, and provision of the fringe benefits options if any were selected by the Monitors

125.    Optum provided the training to the Monitors and its Operations Managers assigned them to teams.

126.    Operations Managers assigned Monitors their schedules and their daily, or hourly tasks and breaks

127.    Upon information and belief,   a few weeks of being hired, Optum designated certain Monitors as team supervisors with a raise in pay.

128.    The supervisor would be a go-between, between the Optum Operations Managers and the Monitors.  The Optum Operations Managers were the supervisors' bosses, and therefore the bosses of the Monitors.

129.    The Staffing Agency supervisors took no direction regarding the job from the Staffing Agencies, only from Optum.

130.    Optum, through its Operations Managers controlled all promotion, discipline and termination decisions.  Although Staffing Agency team supervisors were able to provide input, they had no authority to take employment actions affecting team members.

131.    Optum provided monitors on going guidance for how to perform, such as with tips for dealing with common problems.

132.     Optum provided updated scripts on nearly a daily basis at times, and also when it changed Monitors' assignments

133.     In the course of their employment, Staffing Agency Monitors were given schedules and tasks beyond calling the contacts of positive-tested COVID patients.

134.     Optum added the task of case investigation, to some monitors, and designated them "cross-monitors" with no extra pay or benefits, which raised objections.

135.     Optum reassigned certain Staffing Agency staffers to the "Travelers Program". When COVID restrictions were placed on international travel, Staffing Agency monitors provided guidance and rules to those getting ready to travel out of the country.

136.     Certain Staffing Agency personnel were also redeployed by Optum to speak to candidates for vaccination and to encourage them.  They would let the candidate know where they could be vaccinated and would set up the appointments for the candidates who wished to be vaccinated.   In this, the Staffing Agency personnel acted as conventional call center telemarketers.

137.     According to the Optum schedule they would receive on a given day, the Staffing Agency worker could be a vaccination telemarketer or travel program advisor in the morning, and then pivot to COVID monitoring in the afternoon.

138.     Neither the Staffing Agency or Optum ever told the monitor that their employment would end when a particular date or milestone was reached, or upon the occurrence of a particular event or set of circumstances.

139.     On information and belief, Optum told the Staffing Agency personnel that they should contact their respective agencies to find out when they would be terminated.

140.    Upon information and belief, Insight Global, LLC had given its tracing personnel and expectation of employment lasting until the end of May 2022 but began laying them off in March through mid-April in waves with between one-to-seven weeks' notice.

141.    Apex Systems, Inc. began informing tracing staffers in March that they would be laid off in the coming weeks. Some were given three-to-six weeks' advance notice.

142.    Equity Staffing Group, Inc. began laying off tracing personnel in March and April, with as little as two days' notice.

143.    Upon information and belief, Adecco USA, Inc. began layoff off its tracing personnel in early March 2022, through the end of April, with some employees receiving as little as one week notice.

**Factual Statements Relating to HHC's Failure to Furnish Pay Statements**

144.    Many of the employees managed by Optum, including Plaintiffs Coleman and Holmes, were paid on the payroll of the NYC Health + Hospitals Corporation ("HHC").

145.    As their paymaster, HHC was obligated to provide contemporaneous paystubs or pay statements, which it failed to do.

146.    On May 13, 2022, NYC Health and Hospitals Corporation paid the T2 employees laid off on April 29 for the work week that ended on April 30.

147.    Previously, HHC provided them a statement which they could access. The May 13 payment was not sent to them, nor were they provided a link or means to access it in any form.

**<u>WARN CLASS ALLEGATIONS, 29 U.S.C. § 2104 and NYLL § 860 *et seq.*,</u>**

148.    Plaintiffs bring the First and Second Claims for Relief (the "Claims") for violation of 29 U.S.C. § 2101 *et seq*., individually and on behalf of themselves and all those similarly situated, pursuant to 29 U.S.C. § 2104(a)(5),   NYLL § 860 *et seq.*, and Fed. R. Civ P. 23(a), as a class defined as "all former employees of Defendants Optum, Insight Global, Apex, Equity Staffing Group and Adecco (the "WARN Defendants") who worked in the T2 Call Center and who were terminated without cause, or were terminated without cause as a reasonably foreseeable consequence of the mass layoff  or plant closing by the WARN Defendants on or around between March 1 and April 29, 2022, and within 90 days thereof, and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) and NYLL § 860-a (1),(4) and(6). (the "WARN Class").

149.    Within the WARN Class, Plaintiffs Coleman and Holmes brings the Claims against Defendant Optum for violation of the New York WARN Act on behalf of themselves and those who were terminated without cause on or about April 29, 2022 (the "HHC Subclass"), pursuant to Fed. R. Civ P. 23(c)(5).

150.    Within the WARN Class, Plaintiffs Porcino, Argulo, Powell and Shusterman bring the Claims under the federal and New York WARN Acts against the WARN Defendants on behalf of those who were terminated without cause between March 1 and April 29, 2022, (the "Staffing Agency Subclass"), pursuant to Fed. R. Civ P. 23(c)(5).

151.    The persons in the WARN Class identified above ("WARN Class Members") are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of WARN Defendants.

152.    On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in the books and records of WARN Defendants.

153.    On information and belief, the rate of pay and benefits that were being paid by WARN Defendants to each WARN Class Member at the time of his/her termination is contained in the books and records of WARN Defendants.

154.    Common questions of law and fact exist as to members of the WARN Class, including, but not limited to, the following:

    (a)    whether the members of the WARN Class were employees of WARN Defendants who worked at, reported to, or received assignments from the Facility;

    (b)    whether Defendant unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them 60 days' advance written notice in violation of the federal WARN Act and 90 days' advance notice under the New York WARN Act; and

    (c)    whether WARN Defendants unlawfully failed to pay the WARN Class members 60 days' wages and benefits as required by the WARN Acts.

155.    Plaintiffs' claims are typical of those of the WARN Class.  Plaintiffs, like other WARN Class members, worked at, reported to, or received assignments from the Facility, and were terminated without cause between March 1 and April 29, 2022, due to the mass layoffs and/or plant closings ordered by WARN Defendants.

156.     Plaintiffs will fairly and adequately protect the interests of the WARN Class. Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Acts and employment litigation. Between March 1 and April 29, 2022, Defendants terminated the employment of Plaintiffs and similarly situated employees, as part of a mass layoff or a plant closing as defined by 29 U.S.C. § 2101(a)(2), (3), for which the affected employees were entitled to receive 60 days advance written notice under the WARN Act. Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WARN Class predominate over any questions affecting only individual members of the WARN Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant, and damages suffered by individual class members are small compared to the expense and burden of individual prosecution of this litigation.

157.     Concentrating all the potential litigation concerning the WARN Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the WARN Act rights of all the members of the WARN Class.

158.     Plaintiffs intend to send notice to all members of the WARN Class to the extent required by Rule 23.

## NEW YORK WTPA CLASS ALLEGATIONS, NYLL § 195(3)

159.    Plaintiffs Coleman and Holmes (the "WTPA Plaintiffs) bring the Third Claims for Relief for violation of the New York Wage Theft Protection Act, NYLL § 195(3), individually and on behalf of themselves and all other similarly situated former employees, pursuant to Fed. R. Civ P. 23(a), who worked in the T2 Call Center, were paid by HHC until they were terminated on or around April 29, 2022, and were not furnished a pay statement with their final pay on or around May 13, 2022 (the "WTPA Class").

160.    The persons in the Wage Statement Class identified above ("WTPA Class Members") are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendant HHC.

161.    On information and belief, the identity of the members of the class and the recent residence address of each of the WTPA Class Members is contained in the books and records of HHC.

162.    On information and belief, the rate of pay and benefits that were being paid by HHC to each WTPA Class Member at the time of his/her termination is contained in the books and records of HHC.

163.    Common questions of law and fact exist as to members of the WTPA Class, including, but not limited to, the following:

(d)    whether the members of the WTPA Class were employees who were paid for their work by HHC;

(e)     whether Defendant HHC unlawfully failed to furnish the members of the WTPA Class a conforming wage statement when paying them their final wages and benefits on May 13, 2022, as required by the WTPA; and

(f)     whether HHC is liable to pay the WTPA Class Members a mandatory penalty of $250 per day up to $5,000 for having failed to provide them their pay statement.

164.     WTPA Plaintiffs' claims are typical of those of the WARN Class. WTPA Plaintiffs, like other WTPA Class members, were paid by HHC, were provided wage statements by HHC up until their final compensation and benefits were deposited into their accounts on or about May 13, 2022 by HCC, and were not furnished an accompanying wage statement or pay stub then or within 20 days thereafter.

165.     Plaintiffs will fairly and adequately protect the interests of the WTPA Class. Plaintiff has retained counsel competent and experienced in complex class actions, including the wage and hour and other employment litigation.

166.     Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WTPA Class predominate over any questions affecting only individual members of the WTPA Class, and because a class action superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of WTPA litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant, and damages suffered by individual WTPA Class members are small compared to the expense and burden of individual prosecution of this litigation.

167.     Concentrating all the potential litigation concerning the WTPA rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the WTPA Act rights of all the members of the WTPA Class.

168.     Plaintiffs intend to send notice to all members of the WTPA Class to the extent required by Rule 23

## FIRST CLAIM FOR RELIEF
## Violation of the WARN Act, 29 U.S.C. § 2104

169.     Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

170.     At all relevant times, WARN Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

171.     At all relevant times, WARN Defendants were "employer[s]," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639.3(a) and continued to operate as a business as they decided to order, and carried out, a mass layoff or plant closing.

172.     Between on or about March 1, 2022 to April 29, 2022, WARN Defendants ordered a mass layoff and/or plant closing at the Facility, as those terms are defined by 29 U.S.C. § 2101(a)(2) and 20 C.F.R. § 639.3(i)(6) and (8).

173.     The mass layoff or plant closing at the Facility resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least 500 of WARN Defendants' employees, or fifty or more employees comprising at least thirty-three percent (33%) of WARN

Defendants' workforce at, or reporting to, or receiving assignments from the Facility, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2101(a)(8).

174.    Plaintiffs were terminated by WARN Defendants without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoff or plant closing ordered by WARN Defendants at the Facility.

175.    Plaintiffs are "affected employees" of WARN Defendants, within the meaning of 29 U.S.C. § 210l(a)(5).

176.    WARN Defendants were required by the WARN Act to give Plaintiffs at least 60 days advance written notice of their terminations.

177.    WARN Defendants failed to give Plaintiffs written notice that complied with the requirements of the WARN Act.

178.    Plaintiffs are "aggrieved employees" of WARN Defendants as that term is defined in 29 U.S.C. § 2104 (a)(7).

## SECOND CLAIM FOR RELIEF
### Violation of the New York WARN Act

179.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

180.    At all relevant times, Defendants were an individual or private business entity defined as "employer" under the NY WARN Act and continued to operate as a business until they decided to order a mass layoff or plant closing at the Facilities as defined by § 860-A(3),(4).

181.    On or about March 1 through April 29, 2022, WARN Defendants ordered mass layoffs and/or plant closings at its Facilities as defined by § 860-A(3),(4); N.Y. Comp. Codes R. & Regs. tit. 12 §921-1.1(p)(vi).

182.    The Plaintiffs suffered a termination of employment as defined by § 860-A(2)(C) having been terminated by WARN Defendants without cause on their part.

183.    WARN Defendants were required by the NY WARN Act to give the Plaintiffs at least 90 days advance written notice of their terminations pursuant to § 860-B.

184.    WARN Defendants failed to give the Plaintiffs and written notice that complied with the requirements of the NY WARN Act.

185.    WARN Defendants failed to pay the Plaintiffs their respective wages, salary, commissions, bonuses, health and life insurance premiums, accrued holiday pay and accrued vacation pay for 60 days following their respective terminations, and benefits including health and life insurance coverage, for 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period.

### THIRD CLAIM FOR RELIEF
**Violation of the New York Wage Theft Protection Act, NYLL § 195(3)**

186.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

187.    Defendant HHC failed to provide along a written statement or paystub that complied with the requirements of the NYLL § 195(3) when it paid the WTPA Class Members their final compensation on  May 13, 2022.

188.    Each WTPA Class Member is entitled to mandatory damages under NYLL § 198(1-d), as the penalty for failure to provide wage statements as required under NYLL § 195(3).

189.    Each Wage Statement Class Member is entitled to recover $5,000 in damages under NYLL §§ 198(1-d), due to HHC's failure to furnish the WTPA Class's wage statements within 20 days after May 13, 2022, or thereafter.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, individually and on behalf of all other similarly situated persons, pray for the following relief as against Defendants:

A.    Certification of this action as a class action;

B.    Designation of all the Plaintiffs as the WARN Class Representatives, and of the WTPA Plaintiffs as the WTPA Class Representatives;

C.    Appointment of the undersigned attorneys as Class Counsel for all class members;

D.    A judgment against WARN Defendants in favor of the Plaintiffs and the other similarly situated former employees equal to the sum of: their unpaid wages and benefits, as determined in accordance with the WARN Act, 29 U.S.C. § 2104 (a)(1)(A) and NYLL § 860-g (1)(a);

E.    A judgment against Defendant HHC in favor of the WTPA Plaintiffs and each member of the WTPA Class in the amount of $5,000, as required by NYLL § 198(1-d);

F.    Plaintiffs' reasonable attorneys' fees and the costs and disbursements that the Plaintiffs incurred in prosecuting this action, as authorized by the WARN Act, 29 U.S.C. § 2104(a)(6), NYLL § 860-g (7); and NYLL § 198 (1-d); and

G.    Such other and further relief as this Court may deem just and proper.


DATED:  July 1, 2022

                    /s/    Jack. A. Raisner

Jack A. Raisner
René S. Roupinian
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Fax:    (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for the Plaintiff and the putative Class*